You're reserving five minutes to go, by the way. Very well. Good afternoon. Mr. Earle, before we start, why do we have jurisdiction over this particular appeal? Because the plaintiffs below have claimed that this legislation is preempted by the Federal Patent Act. Was it considered by anyone in regard to the transfer in a panel by the D.C. Circuit? It just seemed to come over here by an order of the clerk. We made a motion to transfer, Your Honor. Does that give us jurisdiction, just because you made a motion? No, it does not. On what basis is that jurisdiction? Once again, because the preemption challenge to this act calls for interpretation of the Federal Patent Act. Specifically, whether the objectives of the Federal Patent Act are at odds with the underlying goal of this statute. So it doesn't arise under the Patent Act? No, it does not arise under the Patent Act. But it requires an interpretation of the Patent Act, specifically the objectives of the Patent Act, as they relate to a jurisdiction's attempt to restrain the constable of prescription drug prices. So with respect to that, then, you have a question as to whether or not we have a jurisdiction on the second prong of Christensen? Your Honor, yes, yes. And I think you do. That was not in your motion, though, that we could see. It was just a joint motion to have it transferred here. Actually, it was a joint motion. A motion. A motion, yes. The plaintiff's complaint did not raise a patent issue, did it? It does not raise a patent issue per se. Once again, it raises the question of whether this legislation is at odds with the objectives of the patent system, of the Patent Act itself, which calls for an interpretation of that. So it would be a substantial question of the patent laws? Yes. There is a jurisdictional question that our field does raise. And we have argued that the district court erred in finding that the plaintiffs will establish their arbitral free standing to prosecute their challenge, their free enforcement challenge. The standard to be applied in that regard is the authority applied by the district court circuit, which, as articulated in the Cedars and Navarro cases, is that the plaintiff established a special priority for enforcement, a high probability that the challenge that will be enforced against them. Let me ask you a couple of questions about that, Mr. Earle. That's a very interesting issue. Two questions. One of them is, is it clear that this court is bound by the precedence of the District of Columbia Circuit with regard to whether the plaintiffs, in this case, have standing? Yes, Your Honor, certainly to the extent that the precedence of the District of Columbia Circuit are valid in light of the authorities of the United States Supreme Court. All right. That leads me to my second question, which is that at the time the standing issue was briefed, you did not have, I think, the benefit of Parker versus the District of Columbia, which is the latest expression of standing law by your circuit, the District of Columbia Circuit. Let me quote to you what they say. In both United Farm Workers and American booksellers, the Supreme Court took a far more relaxed stance on pre-enforcement challenges than Navigar and Cedars, the two D.C. precedents, permit. Then the court goes on to say, nevertheless, unless and until this court en banc overrules these recent precedents, we must be faithful to Cedars, just as the majority in Cedars was faithful to Navigar. It doesn't seem to me that we need be faithful to either Cedar or Navigar. Rather, we need to be faithful to the United States Supreme Court's standing jurisprudence, don't you think? Yes, Your Honor. I don't dispute that at all. So we are, basically, the question I'm asking is, the question of standing is really for us to decide under our precedents rather than under the District of Columbia precedents. Would you agree to that? Under the Supreme Court precedents, to the extent that the D.C. Circuit precedent, as that court has indicated, is an intention with the language articulated in both United Farm Workers and American booksellers. They use that term, intention with. Yes, yes. OK. That helps me understand where we're coming from. Your Honor, if I could use, certainly, an analogy, the standing standard that this court has articulated in its Jenning probe decision and applied thereafter. I think it is clear that the district court erred in finding that the standing had been satisfactorily established. What we have here is no evidence that has been presented that the generic provisions of this act would apply to a given member of these organizations. That's the NAVIGAR standard. Your Honor, the NAVIGAR standard, the Jenning probe standard, even with regards to the rationale of the United Farm Workers case, you still have to show that the statute that's being challenged would be applied to the individual that's undertaking the challenge per the provisions of that statute. Would be or threatens to be. Well, Your Honor, I think the threat is part of the standard. But I think you also have to show that there is a basis for applying the statute to that individual. Once again, if I could use the image of this court's standard, where you have a requirement of reasonable apprehension on the one hand, and then a showing of conduct, or at least intended conduct, that would qualify as infringing conduct. Here, at best, what we have is the plaintiff's apprehension that this act would be applied against them. But they have not shown that they are present in the undertaking of conduct to which this act would be applied or have the intent of doing so. The evidence that they have shown, and I guess the most compelling aspect of that evidence is the legislative district that presented an argument in their brief response to our point, wherein the District Appointment Council articulated the expectation that the act would be applied to two specific manufacturers, Pfizer and Merck. I submit that what that presents, at best, is a reasonable expectation that the act could be applied to those manufacturers. But it does not, standing alone, establish that under the generic provisions of the act, specifically the prior case provision that would identify a manufacturer to whom the act would be applied, could apply to any of the members of these organizations. Though it is a little hard, just stepping back from the legal nuances of state law, which are, as you well know, very difficult to make one's way through, this is a practical matter. It seems that, surely, if the District of Columbia Council thought it was doing anything, and it was going to have a real-world effect, it obviously did think that, that unless it's seriously mistaken, then these people are going to be affected by this death. I agree with that. It seems a little artificial to say, well, we have to wait until we go through one of these elaborate procedures in order to demonstrate to ourselves, with a sufficient degree of confidence, to be able to say there really is a controversy here that we need to address. I don't think that what we're arguing for are elaborate procedures at all. All that we are maintaining is that these plaintiffs should come forward with some indication that, yes, indeed, we either are undertaking present conduct that would be applicable under the statute, or we have the intent, but for the prospect of enforcement of the statute, to undertake such conduct. But because the statute has the flexible standards, I suppose, it's a little hard to say with certainty. If the statute said if you charge more than $9 a pill for this certain drug, then you're within the scope of the statute. Don't worry about the time. We'll extend your time. That would make it pretty easy to say, well, now we know who is likely to be affected and who isn't. Given what I understand to be a fairly complex process of assessment of whether someone is covered or not in a particular instance, that sort of certainty seems a little hard to achieve, even though, practically speaking, we all know that there will be instances in which members of these organizations will be affected, don't you think? Well, Your Honor, I don't think that the information that we contend is essential, but lacking in this record is complex. The promulgation case provision of the statute is pretty straightforward. Certainly, this is a pre-enforcement challenge, so there are a lot of uncertainties as to how the statute will be applied. And the statute does not give a fulsome definition of some of the critical terms. But it does indicate that manufacturers whose wholesale prices in the high-income countries is – that the prices that result in the District of Columbia are 30 percent higher than those wholesale prices in the high-income countries. They are liable under a promulgation case to have to come forward and justify their prices. That part of it is not complicated. Could I ask, given the limited time, let me shift your focus just for a minute to clarify something I'm a little confused about. 28.445.53 states that it's unlawful to sell a patented prescription drug for an excessive price. I'm obviously summarizing. And 45.54 creates this prima facie case. There seems to be a little confusion as to whether there's some sort of safe haven built into this thing. I don't see one. That is to say, under 45.54, I understand that creates a presumption. But putting that aside, do I read it correctly that 45.53 states an absolute rule which could be violated without regard to whether the presumption of 45.54 applies or not? Am I correct about that? Your Honor, I see Your Honor's concern. One of the amici suggests that the statute has a safe harbor. But I don't find that in the statute. And for the record, I want us to be clear on that. I think the safe harbor that's being referenced is the 45.54B, where the manufacturer is allowed to justify and overcome the presumption. I read that as just their defense.  But forgetting the amici's problem, it is true, is it not, that you don't need the presumption in order to invoke the mandate of 45.53, no excessive price. That is true. So you could have an excessive price that was less than 30% of the foreign country prices. I would say that you, conceivably, could establish primary case. Well, I mean, you could win a case, not just a primary case. You could win, presumably, under that statute if you convinced the trial of fact that there was an excessive price. Right. And in that regard, Your Honor, I think the factors that are articulated in 45.54B would still be applicable. As a defense. They would still stand as the defense, if you will, or the outline of proof, if you will, that this price is not excessive. Not excessive. OK, that helps me understand. With respect to the issue of whether this statute is at odds with the Patent Act, one must consider the true nature of the patent right. As this court has recognized on a number of occasions, what the patent grant gives a patentee is the right to exclude. The patentee's right to make, sell, or use the patented entity is not part of the grant. That is the natural right that the patentee has regardless of the grant of the patent. And as Judge Rich has observed in his 1942 treatise on the nature of patent rights, the natural right to make, use, or sell is subject to the general law. It's subject to the application of the state's police power to protect the citizenry, certainly from outrageous and unconscionable trade conduct. And that is what has been undertaken here by the District of Columbia. Would that same logic really be applicable to any patented product? If televisions were being sold in the District of Columbia at a higher price than they were sold in China or somewhere else, would it be an excessive price aspect of it? I think the District of Columbia, as could any jurisdiction, would be concerned with the unconscionable pricing of items other than prescription drugs, yes. Any patented product? Any patented product, yes. What about unpatented products? Yes, that as well. So you're saying that the District of Columbia could say that all products which are excessively priced within the District of Columbia, based upon a particular base price, whether it's a foreign price or another state price, could be subject to challenge by the District of Columbia? Yes, I am saying that the District of Columbia, as does other states, has the police power to regulate the excessive prices. Let me see if I understand where the distinction between the power to sell and the power to exclude goes logically. Would you go so far as to say that there would be no preemption, for example, of a statute which says to all manufacturers of patented drugs that you may charge your marginal cost, that is to say the cost of producing, not the cost of research or anything else, not the capital expense, none of that, but just your marginal cost, of production and distribution, but no more. Which is to say that you will have, we will simply say that you are going to be in the business of providing a public service, in effect, for free. But you will have the exclusive right to provide that public service for free. Would that be a, I mean, setting aside any due process or substantive due process or anything else, would that be preempted by the patent law? I would say it would be preempted by the patent law. Why? It's the purpose of the patent law. Well, in other words, what you mean is to make a profit that would be greater than the profit that that patentee would make in the absence of an exclusive right. In the presence of competition. To use a nasty word, monopoly profits. Monopoly profits. Right. But once you say that, it seems to me then we're just sort of haggling over the price. We've already established that preemption has a role to play in the question of whether there can be price limitations, aren't we? Well, Your Honor, to you as a private developer, if you have a law that explicitly excludes the opportunity to pursue research and development. Well, I'm not saying you can't do it. I'm just saying if you're going to find the money, you better get it from a foundation. In other words, you're just limiting the price. That's the only thing you do. If you have a law that excludes pursuing research and development from the profits that can be gleaned from your monopolization of the market, I think there is a problem there. Because the underlying premise of giving the monopoly is that it would encourage research and development. But there are other premises, too, underlying the patent laws that are very closely aligned with the premise of encouraging research and development. One of which, again, to use a dirty word, is greed. I mean, the idea of the patent law is predicated in part on the idea that inventors animated by eagerness to do very well in the market will put in extra effort. Now, drawing a line between research and development, which sounds good, and greed, which sounds not so good, is a line that I don't see the patent law drawing. I mean, where would it be? Well, and I agree with the patent law that doesn't draw it. But more importantly in the context of this case, Congress has not excluded the right of the states to exercise their police power to draw that line. Well, that's my question. I mean, that's what we have to decide. Well, a lot of Congress, Mr. Earle, has recognized, I'm sure you're familiar with the Hatch-Waxman Act, the legislative history. In that act, Congress stated, the patents enable innovators to obtain greater profits than could have been obtained if direct competition existed. These profits act as an incentive for innovation activities. Don't you think that there's a recognition of the particular profits that drug manufacturers need to obtain in order to innovate? I would accept that as that recognition, but by the same token, that does not suggest that Congress has meant to forestall the states from undertaking their responsibility to their citizens of restraining the pricing of patent prescription drugs. Where those drugs cross the line between undertaking and encouraging innovation and the furthering of immediate research. But if Congress sets up a structure which allows for generic drug manufacturers to compete within that particular structure, Isn't that really an intent by Congress to take over that particular aspect and saying to everyone else that we will allow the competition to take place through generics, and we will allow the patented drug companies to maintain their prices or their profits without any control on prices? Is that an inference that can be taken from that? Your Honor, I submit that that does not support that inference. What that supports is certainly the intent of Congress to ensure that the patent team has the full opportunity to utilize and exploit the market extensively that it has for a realistic period. That's not undermined by the period of regulatory review that the HECWAC format was, in part, intended to alleviate. But that does not speak to, one way or the other, that this is the only means by which Congress views the ultimate rendering of lower prices to consumers to be pursued. This raises a related question, and that is, the statute, the ordinance, what do you call that, an ordinance or a statute? The statute. The statute. The statute appears to contemplate case-by-case litigation. Yes. And one of the questions that I'm puzzling about is, if you do case-by-case litigation, would the problem of interference with R&D profits, with whatever, you concede that Congress had the notion of allowing an inventor, a patent holder, to make something more than just the cost of production. Allowing them the opportunity. The opportunity. Not to give them the opportunity. Absolutely. And I want to come back to that. We'll talk about monopoly a little later. But for the moment, on the case-by-case basis, is it your notion, does the statute contemplate that that issue would be litigated in the context of any particular drug product or any particular prescription that was thought to be excessively priced? Is that the notion that that issue... Let me put the question a little differently. Is the issue before us on this pre-enforcement preemption phase substantively different from what it would be if it came before us on a question of whether a particular prescription for Nexium or Prilosec or whatever was overpriced? Would the issues be the same in your thinking? It would be different. Because at this facial challenge stage, what we are undertaking or what the plaintiffs would have to establish is that there's no conceivable interpretation of the statute that would not interfere with the objectives of the patent act. Once again, if you accept the premise that the grant of the patent is the power to exclude, not the power to sell, use, or make, then you have to accept the sequence to mean that although the patent statute, coupled with the Tax Waxman Act, certainly reflects Congress's concern for giving full opportunity to a patentee to pursue the prospect of gaining profits that would encourage research and development, that still does not give the unfettered right of the exercise of price and discretion that would free, under any circumstances, a patentee from regulation by the state. But that latter question would be the same whether it came up in pre-enforcement or in individual litigation. It would be if a given plaintiff made a claim that obviously was proven to be an unreasonable obstacle to a given manufacturer's pursuit of research and development. Not only would that be, I would submit, a valid defense under the statute's own terms, but it would also give a basis for a preemption argument as well. The drug manufacturers have an ability to sell. I'm sorry? They have an ability to sell within the parameters of their patent. Yes. What if they decided that because of the restrictions imposed on prices, we'll just withdraw from the market? We won't sell. I don't see that as being a basis for preempting the statute. That would be a decision that the patentee is free to make, but not compelled to make, certainly under a conceivable interpretation of the statute. Actually, Your Honor's question touches upon the substance of the appellee's foreign commerce claim, wherein they argue that because our statute makes reference to the pricing in the high-income countries, that that by itself is a violation of the foreign commerce clause. As we pointed out in our reply, there's a distinction between a statute which has the effect of regulating commerce in another jurisdiction and one that has an effect on those commercial decisions. To be sure, this statute may have an effect on the commercial decisions that the manufacturers make, the multinational manufacturers, but that is certainly not the same as regulating their content. Their content is regulated by those foreign countries, not by the statute. The record suggests that the District of Columbia has very high drug prices. Yes, Your Honor. Is there any explanation for why they're higher in the District of Columbia than anywhere else? Or not anywhere else, but higher? I'm not in a position to illuminate the Columbia. Okay. I think we've gone quite a bit over, but I think it's time usefully spent. Why don't we restore your full rebuttal time, and Ms. Thomas will add 20 minutes to Mr. Ogden's time to take care of the additional rebuttal time as well, in case 15 plus 20. Thank you. Mr. Ogden, I understand the financial impact that all of this may have on your clients, but in the future I would hope that your clients could come up with a little money to get a better binder. My pages have fallen out on me, and it makes it very hard to follow your arguments. I apologize, Your Honor. I certainly will try to justify it. Thank you. But I think it may establish our interest. Your standing is obviously excellent right here. Cause of limitation on pricing. I want to first address the standing arguments that the District Attorney has raised here, and then turn to the preemption issues that have fallen on me. Critically, the standard that applies here needs to be the standard applied by the Supreme Court of the United States. And if you satisfy the precedence of the Supreme Court, then you clearly have standing in the case. And therefore, I think Mr. Ogden, he's the appropriate place to look here. This is Supreme Court precedent. I do think you satisfy the Parker test, but I think that Parker itself reflects that that goes beyond what's necessary in the Supreme Court's standards. You agree we are not, in any sense, bound by the D.C. Circuit's problem of standing, but we're free to make our own standing decision? I absolutely agree the Microchip Technology case stands for that proposition in the 2004 decision of this Court. And I don't think it makes that much sense. The rule of convenience, it's a deference to the Reasonable Circuit cannot apply when this Court concluded that the Reasonable Circuit was bound by its own authority. And so it is the Supreme Court standard that applies. And that is under the test set forth in the Farm Workers case, set forth in the Pinnell case. They're standing to bring a pre-enforcement challenge where a challenger faces, quote, a realistic danger of sustaining a direct injury as a result of a staffed operation or enforcement. In fact, D.C. in its brief conceded at that point that that was the correct test. And the Supreme Court has gone further and made clear that a well-founded fear, which is the language of Virginia American booksellers, a well-founded fear that the law would be enforced for a realistic danger, in the words of the Farm Workers case, is merely one that is not imaginary or holding speculative or unadorned speculation. That's from that in Pinnell. Here we've easily made that standard. I think Mr. Earle conceded in his argument in response to questioning from the bench that the D.C. Council clearly thought that our members were affected by the crisis, charged by our members with threats that will be sold here in the district, were potentially violent about the staff. And they are violent. Which is the question that we should be asking here? Is it the question of whether you will be likely to be subject to the Act as in targets of actions, or is it whether you will be ultimately found to have been violent about the Act? What's the right standard to look at with respect to the standing issue? It's sufficient to establish the ending that means that there is a realistic threat of prostitution or enforcement. That is, of a lawsuit. And in fact, in the Teva Pharmaceuticals decision just last week, this court looked specifically at the threat of protracted litigation as a sufficient basis to support standing, even if you're not ultimately in violation. And this court frequently entertains standing in the declaratory judgment context, in which the position of the plaintiff is that it's not in violation, but that it stands a risk of being sued. And it's that risk that establishes that that is a realistic danger. And it's a realistic danger either that you may be subjected to enforcement efforts, or that to avoid that, a reasonable fear of that, that you would conform your conduct to the statutory command, and therefore forfeit the federal rights which you assert. That's the realistic danger in metamu. The court talks about that that decisive thing, that there's a sufficient risk of enforcement or of coerced compliance that suffices. And here, the statute itself declares in its findings that current market prices are excessive. And it says it's incumbent on the government of the District of Columbia to take action to restrain it. And it singles out manufacturers as the sole entity, and their licensees as the sole entity against whom the statute can be enforced. It exempts retailers. And in the legislative history, it also empowers literally anyone to sue, anyone representing a public interest as a private attorney general can enforce the law, whether they're directly or indirectly injured. And in the legislative history, the sponsor, as was noted, singled out two members of pharma who were members of both pharma and bio, and specific patented drugs sold by those members, and said not only that they would potentially be subject to suit, but said that their specific patented pharmaceuticals exceeded by more than 30% the prices for those pharmaceuticals charged in one case, Germany, and in another case, Australia, which are the benchmark countries. So in the legislative history, two of our members were singled out as satisfying the presumption, and the sponsor said they had an opportunity to explain those differences in litigation. With respect to the explanation, I don't know if that's actually the state program, but 4554B, I guess, is the provision. Does that contemplate an explanation that would go to the specific cost of development of a particular drug, as you read that, or does it allow the defendant to make an argument that the defendant is engaged in the production of numerous drugs, most of which are never made successfully to market? You understand the argument. I understand your question, and I think this is absolutely ambiguous in limiting the justification, the cost justification to a particular drug. I mean, you could always say, well, the cost of production includes all the drugs that we didn't bring to market, and we're allocating all those costs to this drug, which we did. But your take on it is that that would be at least a stretch? That's not—I mean, I think the literal reading of the statute is intended to conclude it, although, you know, one doesn't know. I think it points out, jumping to the merits, one of the fundamental problems with this statute, which is that it sets up the idea of case-by-case litigation under the shadow of trucker damages, in which a D.C. judge or a D.C. jury would go about attempting to apply the factors that Congress has looked at repeatedly over many years in setting up the scheme of patent protection and in the implementation of patents that Congress has put in place, but perhaps in ways that are entirely different or at least somewhat different than the way Congress itself has thought of it, so that it may lead to the cost of developing other drugs, which may involve hundreds of millions of dollars or more, and drugs that never produce profit can't be considered. And it highlights both the terrorism of allowing a litigation system to pass drug-by-drug on whether a price or an amount of compensation is appropriate, and it also, I think, shows the way in which the D.C. law sets the balance or threatens the balance that Congress established. Although, if Congress did it, there would be absolutely—well, maybe not absolutely, because it's one of those arguments, but obviously the preemption issue would be gone, but if Congress wrote exactly that statute, I can't think of how you would frame an argument that that's invalid. Well, there would be a preemption argument. I think that's correct. Congress, despite—repeatedly over many, many years in the pharmaceutical context— has considered the issue of supporting innovation in these critically important products, the issue of the availability of these products to the widest number of people, has used the generic mechanism and has, frankly, expedited the entry of— What if the District of Columbia adopted a statute that taxed patented drugs on a proportional basis and said the tax will normally be 100 percent of the sale price, but it can go up to as much as 300 percent unless the manufacturer can show and then puts out those factors that it already has in the statute? What about that? I think that statute would be—if I understand the hypothetical, Your Honor— would be preempted for the same reason that this one. What about the Weber case, Weber v. Virginia? Well, Chief Justice Marshall in McCulloch's demerit case himself said that a tax targeted at patented goods, limited to patented goods, would be a violation of the Brown v. Claus. And that's because, and particularly where it's targeted to the higher prices of patented goods, it's a special burden that would reduce, in a targeted way, the benefit that Congress intended to make possible. A general tax obviously doesn't raise those kinds of issues. A tax that applies generally to all products. But a special targeted tax that's targeted to patented products would be problematic, especially if it's further targeted to pharmaceuticals, where Congress has enacted a scheme in quite a very fine and precise way to try to make these incentives target special areas, so that, for example, pediatric testing merits a six-month extension of the exclusivity period. If D.C. or any other state can come in and issue targeted taxes at those very drugs, it would take away entirely the countermeasure incentive. But all of those provisions in the patent law are always directed, and I think this is true of everything in Hatch-Waxman, at playing with the exclusivity factor. As Mr. Earle has pointed out, that's the core concern in patent law. Now, there may be an assumption that along with exclusivity goes the opportunity, assuming the conditions are right, to make large profits. But the question that makes this case hard, it seems to me, is a question of conflict preemption, is whether Congress has simply said we aren't going to tend to that question of whether you will actually be able to make large profits or not. We'll just tend to the question of exclusivity, and the rest of it will be up to all the other considerations, including the market, including state regulation, including customer preferences, including the availability of competing products that are not within patent. You're on your own after you have the exclusivity, but the exclusivity is the right that the patent law gives you. Now, where do we find the connection between the exclusivity and the opportunity to make substantial profits as something that's been blessed by Congress? The inquiry under the implied preemption doctrine, under the obstacle preemption doctrine, whether the state preemption coded an obstacle to the accomplishment and execution of the full purposes and objectives. But the question is, where is it in the Patent Act that says one of its purposes is to let you make big profits? Well, what is the premise? And this Court has repeatedly said that the fundamental purpose of the patent agreement is the encouragement of investment-backed risk. And that is also, as I think Judge Garrison pointed out, the purpose of much of the Congress' legal exclusivity law. This Court said in the five-year case that the Hatch-Waxman, for example, the incentive to develop a market product to require lengthy pre-marketing approval is intended to be preserved in the law. So it is the encouragement, the incentivizing of investment-backed risk, which is the purpose. The exclusivity right is a particular means and an essential means by which that purpose is meant to be accomplished. But the measurement of whether a law, a state law, presents an obstacle to the accomplishment of those purposes has to look at how that exclusivity right is intended to create the encouragement of investment-backed risk. And this Court has addressed that question, too. I have a number of others. This Court has, in the King Instruments case, explained that, following, the Patent Act creates an incentive for innovation. The economic rewards during the period of exclusivity are the carrot. That is, it's the economic rewards during the period of exclusivity that are the incentive. The exclusivity itself is the mean. And then the Court went on to say, upon grant of the patent, the only limitation on the size of the carrot should be that it exceeds the marketplace. Now, it is an obstacle. So the key issue is, in the marketplace, subject to general background regulation, of course. And that's a little bit of an overstatement. Mr. Robinson? The statement that the Court, I mean, this is our statement, so I didn't criticize it, but that's a bit of an overstatement because there are all sorts of things that can be out there, created by the State, that will restrict the ability to make a profit, including that the District of Columbia could increase the sales tax across the board by 5%, and then I suppose you could raise your prices. But that would certainly have at least some effect on your ability to make a profit. Those kinds of general background regulations, the general non-discriminatory tax, the general health and safety regulations, isn't targeted to patents, or doesn't zero in on the profits to be made from patented goods. It's part of the general environment in which the marketplace is expected to operate. You produce a patented good. How useful is it? How valuable is it? The price you can charge depends, during the period of exclusivity, on the effectiveness of non-infringing substitutes. That will keep the price at the level the market establishes. That's the premise of the patent, was during exclusivity, there's a patent treaty that's created by that exclusivity, which is the difference between that state of affairs and the state of affairs when the patent is terminated. And competition from generics in the pharmaceutical area comes in, removes the patent treaty. That patent treaty, that delta, between what the patented good can earn and what the good option can earn, that is the incentive, that is the carrot, that is the engine of patent law and pharmaceutical activity. But isn't the Hatch-Watson Act enacted by Congress really an attempt by Congress to provide for an expedient method of getting generic drugs to market for competitive purposes, at least trying to create some competition for some of the patented drugs, even during the term of the patent, if they can challenge the patent under the certification? Why wouldn't the D.C. statute then be considered complementary to that intent of Congress to maintain competition and to essentially provide drugs at a reasonable price to consumers? The Hatch-Watson Act does a number of things, but it addresses the patent premium and the incentive side, the carrot side, in a very precise way, and it addresses the price control side in the sense of mechanisms to bring the price down. And the thing that's central to it all is that the mechanism Congress is using is a market mechanism. Hatch-Watson extends the patent period during the period of FDA approval consideration of new drugs up to a five-year period. That is specifically because of the concern that Congress had that the long delay in obtaining approval would be into these financial incentives. The D.C. law is not complementary because it takes away the various incentives, essentially. To the extent that it operates at all, the incentive to fund the patent premium is too high. It takes away the various incentives that Hatch-Watson Act intended to extend. Hatch-Watson has also been constructive, Your Honor, and I think that you make the point quite important. And to the way Congress expects the rule of patent or the rule of pharmaceuticals to operate, which is we need to have this incentive of a full patent premium, the full incentive, not just to incentivize your development of new products in terms of paying for it, but in terms of getting a confidence in it to cause people to make these extraordinary, highly risky investments. We want to have that big incentive. We're going to do it by having a period of exclusivity during which we can get the full patent premium. But we're also, in the pharmaceutical area, we're going to bring in generic and allow them to enter the market very fast so that when that period ends, the patent premium is gone. For D.C. to attack the patent premium is for D.C. to attack the entire engine of innovation that Congress has established. And that's the central point of this case. How do you... Even though Congress did not speak to the issue of regulation of prices at Hatch-Watson, was an inferential type of a statement? Well, it's the classic circumstance, I think, where Congress's decision over long periods of time not to engage in certain forms of regulation, coupled with the obvious statements of what their purposes are and the obvious understanding of how this mechanism is supposed to work, makes clear that Congress doesn't want it. It has decided that leaving that unregulated is the best approach. And in Hatch-Watson, you know, Congressman Waxman did address, and he explained how all of this works. He addressed it in a way very much in line with the way this court understands the purpose. If you were sitting on the D.C. Council and you were looking at what seems to be conceded high, if not extremely high, prices for pharmaceuticals in your jurisdiction, and you were looking at a substantial population of people who are uninsured in the health care field and needed drugs, how would you go about making it possible for those drugs to be more accessible to your citizens? Well, there are any number of different mechanisms that exist, obviously. There are the federal health care programs that the pharmaceutical companies themselves have. You're on the D.C. Council, and you're not the president of the United States, in my hypothetical. So the federal government isn't going to help you. Now what? Well, Your Honor, I think there may be a number of things with respect to state programs and city funding programs. Would you object to a tax? I think as far as a tax, a patented pharmaceutical is simply not appropriate. It is a specific burden, substantial one, on the federal government. The College of Maryland itself stands for the proposition that the D.C. can't do that. A tax would be very problematic. What would you suggest then, Counselor? I guess what I suggested is that I think there are a possibility of funding programs, obviously. But what D.C. can't do is to target patented goods and to target the patented premium pharmaceuticals, which Congress cares about. Congress has developed a scheme to create the finest pharmaceuticals, the finest drugs in the world, and that scheme depends upon the patent premium. That's the genius or the heart of the United States program for encouraging innovation. It's permitting these, during the limited period, targeted limited period, to allow that patent premium to be earned, to let the states come in and say, no, that's too much in this case, or it's way too much in that case, we're going to have trouble damaging it. There's another critical one here, which is the deterrence factor, which I think is quite important in terms of recognizing the interference with Congress's objectives. When you attach trouble damages to sales that can occur anywhere in the United States, and you attach trouble damages to all the dealings that a company has that end up in the District of Columbia, you create a tremendous interior effect that in and of itself is going to deter companies from charging what the market will bear, which again is the underlying assumption of what Congress is going to do. I think a moment ago, when you were talking about the role of state health and safety regulation, those kinds of across-the-board, non-targeted regulations, you mentioned in your list of factors that would render those benign in our context that it wasn't directed at limitations on price, although it might have the effect of limiting the profits that companies could make. What about an across-the-board, this is a targeted statute, clearly, but what about an across-the-board provision that simply says the District of Columbia, the policy against excess prices, whether it's for television sets, drugs, or bicycles or anything else, and whether it's patented or not. Now, the impact might be, and it's calculated according to some number, whether it correlates to foreign countries or not, but it definitely puts a ceiling of some sort on the profits that anybody can make on sales in the District of Columbia. If it's not targeted as patents, do you think it's preempted because it has an impact on people who have patents? No. I mean, I don't think for that reason alone, I don't think it's preempted. I think that laws in general have the ability to truly operate in a neutral fashion. When you say operate in a neutral fashion, now, let me hasten to say that we'll assume that the bulk of the actions brought under such a statute will be against people who have monopolies, and patents will be the most common reason to have monopolies. So we'll stipulate that 70% of the actions that end up getting brought turn out to be against people with patents, and a lot of those will be against pharmaceutical companies. But you think it's still okay. It's not preempted by the patent law. I think it lacks the two critical elements here that make this clearly a fact that has to be preempted. The two critical elements being the focus on the pharmaceutical area, which is critically focused on by Congress for many years, and many statutes titrating these benefits and the limits in a very precise way based on the idea of the patent provision, and the singling out of patented goods. Either of those things, your statutes are composed of substantial burdens that's targeted at the patent premium. Independently would be a sufficient basis. If you take both of those away, I think you end up with a much more nuanced inquiry as to how the statute actually operated. You have to look at what the federal statutes were that were being suggested as being threatened. And the details become very important in that situation. Let's step back one step from Judge Price's hypothetical. Let's assume the regulation of the statute applied only to all patented goods. Would that be a problem? I think it would be a yes. A general statute that said all patented goods must be sold and cannot be sold at an excessive price. I think that would be clearly a problem. You don't have the Hatch-Waxman folks here. You don't have Hatch-Waxman, and you don't have the special issues of pharmaceutical regulation that has occupied a tremendous amount of Congress's attention over the years. So you've got one of the two babies. But I think either is beneficial. If you target patented goods only to take away the patent premium, there's a frontal assault on Congress's patent policy. And if Congress could have its own instituted scheme where if you have a patent, you have to justify your price, you have to be tighter, you have to be a case by case decision when you're recovering too much or not recovering enough, that's not what Congress did. So your answer to Judge Bryson's hypothetical of a neutrally stated cap, I take it is, well, we'd have trouble with a pre-enforcement suit, but boy, we could come at you if you came at us individually. Well, I don't think I would probably phrase my answer that way. What I was struggling to express was that we rely on the two highly problematic aspects of this law, the singling out of patents, the singling out of pharmaceuticals, the targeting of a patent premium, and the end-to-end suit. If you take both of those away, the issue becomes more nuanced. You have to look at the less played history of the patent and the way federal policies are affected. Because ultimately, obviously, as you know, ultimately, you back in not only to the Patterson case with the health and safety regulations, but ultimately, Nebby against New York. And you wouldn't think that you would be able, you would have a constitutional regime that would say that price limitation is permissible as long as the only goods that are regulated are not protected by patent. And that would be peculiar, I think. I think that probably would be peculiar. And I think, again, if the state is legislating with a foster board, it could have health and safety regulations. It could have taxes. Or even price controls. I mean, Nebby was a price control case. They said, you can sell milk up to this price at no more, really. And your hypothetical, which doesn't focus either on pharmaceuticals or patents, poses that case. And the only footnote I want to put on it is I need to see the statute, and you need to see how it works, and whether it interferes with any congressional objectives or not. But I think those are the two key elements that we rely on. I think we have a case. I'd like to turn briefly, unless there are other questions on the printer and issues, to the question of foreign commerce clause. This case is really on all fours, in this respect, with the Huey and Spears case, which, in the context of the New York State Commerce Clause, status and validity of a regime in which the prices in one state were not permitted to exceed the prices in another. And the reasoning of the Supreme Court in the Huey case, as to why a state cannot do that, fully applies here. And it validates each and every application of the timing provision of the statute. What Huey said is, by timing maximum future prices in one state to the lowest prices in other states, such laws control pricing decisions in those other states by requiring that those decisions reflect not only local market conditions, but also market conditions in the regulated state, market conditions that would be irrelevant after the binding force of the statute. Mr. Earle conceded, and he has conceded because the record is clear in the operation of the statute, it's obvious, that pricing decisions in foreign countries necessarily would be affected by the District of Columbia statute. And all the more so, of course, if other states were to enact similar provisions. You would have to consider the potential for travel damages in the United States, the potential for being a violation of the law in the United States, the potential for rejection from the United States, when you decide whether to do business in Australia or Germany or Canada. You have to consider the impact of your pricing in the United States when those more command-driven governments require prices to be at marginal cost or very close to it. And as the value pharmaceutical company says in their affidavit, if the DC law applies, they're not going to even sell their drug in Australia or in Canada because they don't want to have that consequence. Well, that extra-territorial regulation, that effective regulation in the sense of healing of those foreign transactions is violating the foreign commerce laws, which is at least as restrictive of extra-territorial regulation in the United States as it is in Canada. And the district judge declines to address this issue because he concluded to me it was, frankly, it was superfluous as an operational matter since he invalidated the statute of holdings. But beyond that, he didn't use it because he said that it was an improper facial challenge because there might be applications of the statute in which the particular provision was not invoked. But it is an improper facial challenge because there's a challenge to that provision, which is improper in all of its applications. Any time you attach a significant legal consequence to the application of that provision, it induces this improper regulatory effect. It's therefore necessarily invalid under the foreign commerce laws and needs to be stricter. We believe that as a result that we use the statute that as a whole has to be invalidated. But that provision cannot be severed. Because that provision, that time-efficient case, is the only aspect of this statute that provides any guidance whatsoever about what is or isn't an excessive crime. And if you end up with a statute that has none of that amount of guidance, it's, first of all, probably invalid for a number of other constitutional reasons given its lack of determinants. But it's not plausible that the counsel would have enacted a law with no standards at all. They don't have the usual, if any one part is severed, the rest is still good provision, do they? There's not a clause that time in the statute itself. Could you comment just for 10 seconds on the question that Judge Gayarza raised at the outset, which is why are you here? I take it when you filed your complaint in the District of Columbia District Court, you did not see it as a patent case. Well, the case turns. We believe that when District of Columbia suggested that their appeal should be in this court rather than in the DC Circuit, which I don't look at this, they concluded that their position was a reasonable one in that under the second aspect of the Christensen decision, section 1338 applies that a plaintiff's right to release necessarily depends on the resolution of a substantial question of federal patent law, and that patent law is a necessary element to form a convoluted claim. And we do think that our preemption arguably turns to a significant degree on the question of patent law. That is, the degree with which the DC law obstructs the purposes and objectives in their full achievement. We believe it's reasonable to view that as a substantial part of federal patent law for purposes of this court's jurisdiction, which is why we did this objection. Very well. Thank you, Mr. Hagen. Mr. Perl, I think we reserve five minutes for you. Let me emphasize, first of all, with respect to the preemption, that notwithstanding the patent premium that counsel has made reference to, there is no authority for proposition that patentees' commercial conduct is completely free of regulation. Not even in the pricing arena. This court has recognized in application of the patents use doctrine that minimum price fixing agreements between patentees and their licensees is, per se, a violation of the antitrust act. That pertains to the exercise of a patentee's pricing discretion. But that doesn't raise supremacy clause problems, since the regulator is part of the supremacy. That is true, Your Honor. But it does reflect that the grant of the patent and the operation of the patent act does not envision the commercial conduct of the patentee to be free of regulation. Even granting the idea that the grant of the patent is intended to motivate the patentee by any desire for profit to undertake research and development that ultimately will benefit the community, notwithstanding that emphasis on the prospect of profit, it is not on the marketplace that this court makes reference to in keying instruments. It's a marketplace that innately includes the prospect of reasonable regulation by the states of commercial conduct of patentees. A great deal of emphasis is placed, as you can tell, in his argument on the fact that this statute singles out patentees for regulation. First of all, that is not, in and of itself, inappropriate, as Alan Richard Robinson teaches us. And I would submit that in this case, there is a justification. Someone at the back there was present. And now, the special evil here is the unusual ability to pursue unconscionable pricing needed prescription drugs. It is reasonable for the counsel to have concluded that it was not necessary to undertake their police powers with respect to non-patented drugs, because the marketplace itself, the competition that's present in the marketplace as to those entities, would act as a natural restraint. Nonetheless, it was appropriate and reasonable to undertake an exercise of the counsel's police power with respect to patented prescription drugs, because of their market monopoly granted by the patent. So that rationale for striking down this statute, I submit, is not well-founded in the context of the exercise of the counsel's police powers. With respect to the argument on the application of the Foreign Commerce Clause to this statute, as I indicated in my earlier remarks, there is a distinction to be drawn between the statute that was at issue in the field that clearly had the effect of regulating, of forcing the vendors in other states or non-regulated states to alter their prices or maintain their prices in response to the requirements of the regulated state. And the circumstance here, where there might be a consideration being given by the patentee to the presence of this statute, but that does not